GODDARD *vs.* THE MERCHANTS' BANK.     [147]

The drawee of a bill is bound to know the hand-writing of the drawer; and if he pays the bill to a *bona fide* holder, he can not recover the money back, although the bill turns out to be a forgery. (*a.*)

And the same rule applies in general, it seems, to a party who intervenes and takes up a protested bill for the honor of the drawer. If he pays the bill after seeing it, he is concluded by the act, and cannot recover back the money, although the bill is a forgery.

A forged bill purporting to be drawn by a bank in Ohio, was presented to the drawees in New York, and payment refused *on Saturday*, for want of funds of the drawers. On *Monday* following, the plaintiff, on being informed of the matter, called at the office of the notary who had the bill for protest and notice, and left his check for the amount, in order to take up the bill for the honor of the drawers. In consequence of the absence of the notary from his office, he did not see the bill, but left word to have it sent to his place of business. The notary on the same day delivered the check over to the holder of the bill, but did not send the bill to the plaintiffs. The plaintiff called again the next day at the office of the notary, and, on being shown the bill, ascertained and pronounced it to be a forgery. *Held* that under the circumstances the plaintiff was not chargeable with negligence, and that he was entitled to recover the money he had paid on the ground of mistake.

And although in consequence of the omission on the part of the plaintiff sooner to declare the forgery, the notices of protest were not sent out until *Tuesday*, when it was too late, yet *held*, that this was no defence to the action. The defendants who held the bill for collection merely needed no recourse to any other party, and the payee who forged the bill was answerable to the owner without notice of the dishonor.

APPEAL from the superior court of the city of New-York, where Goddard and St. John brought assumpsit against the Merchants' Bank, to recover back money paid by mistake. On the 15th of September, 1847, a man calling himself E. S. Moore, presented to the bank of Rutland, in Vermont, a draft as follows:

---

(*a*) See *Bank of Commerce* v. *Union Bank*, (2 Comst. 230.)

3

[148] "$1000.          Cleveland, Ohio, August 28, 1847.
    Canal Bank,
          Pay to order of E. S. Moore, one thousand dollars,
value received, which place to the account of
                              S. H. MANN, Cashier.
    To American Exchange Bank, N. Y.
          No. 214."

The man calling himself Moore, indorsed the draft to the Bank of Rutland, and received $1000 for it. He was not seen or heard of afterwards, and his residence was unknown. The drawer's name to the draft was forged.

The Bank of Rutland sent the draft, for collection, to the Farmers' Bank of Troy, and that bank forwarded it for collection to the defendants' bank in New York, by which it was received on Saturday, Sept. 18, 1847. On the same day the defendants placed the draft in the hands of Mr. Campbell, a notary, who presented it for payment at the American Exchange Bank, (the drawees); the teller of which refused payment for want of funds of the drawer. The plaintiffs, Goddard and St. John, were the correspondents in New York of the Canal Bank at Cleveland; and on Monday morning, Goddard called at the office of the notary where the draft was, and left his check for the amount, but did not then see the draft, in consequence of the absence of the notary. On the following day, Goddard, on seeing the draft, pronounced it a forgery. Notice was immediately given to the defendants, and repayment of the money demanded, which they refused. The circumstances attending the payment of the draft, and affecting the question of negligence on the part of the plaintiffs, are sufficiently detailed in the opinion of BRONSON, J.

The plaintiffs recovered in the superior court, and the defendants appealed to this court.

*B. W. Bonney*, for appellants.

*H. E. Davies*, for respondent.

Goddard *v.* The Merchants' Bank.

BRONSON, Ch. J. delivered the opinion of the court. [149]
The drawee of a bill is held bound to know the hand-writing of his correspondent, the drawer; and if he accepts or pays a bill in the hands of a bona fide holder for value, he is concluded by the act, although the bill turns out to be a forgery. If he has accepted, he must pay; and if he has paid, he can not recover the money back. This is an exception to the general rule, that money paid under a mistake of fact may be recovered back. The exception is fully established; but I do not see that it applies to this case. As the plaintiffs intervened and paid the bill for the honor of the supposed drawers, I do not doubt that the exception would have applied to them, as well as to the drawees, had they seen the bill before they parted with their money; but they had not seen it. They had had no opportunity of judging whether the bill was in the hand-writing of their correspondents, the drawers, or not; and consequently the argument which concludes the drawee when he pays after sight of the bill proves nothing against the plaintiffs. Their case is out of the exception, and within the general rule; and I see no reason why they should not recover.

But it is said that the plaintiffs are chargeable with negligence in paying the draft before they had seen it: also that they prevented the service of notices of protest on Monday the 20th of September, the last day for giving notice; and consequently they can not recover. How are the facts? The plaintiffs were informed on the Monday morning in question that there was a draft for $1000 drawn by their correspondents, the Canal Bank of Cleveland, on the American Exchange Bank; that it had been protested on Saturday, and was then in the hands of Notary Campbell. This information they got from the teller of the American Exchange Bank, the teller of the Mer·chants' Bank, and from Mr. Riker, another notary, who occupied the same office with Mr. Campbell, and who received papers and answered questions for Mr. Campbell when he was absent from the office, as he was when Goddard, one of the plaintiffs, called to take up the draft. On this information God dard acted; and supposing that the Canal Bank had by mistake

[150] drawn on the Exchange Bank, with which it had just before kept an account, instead of drawing on the plaintiffs, and wishing to protect the credit of the drawers, he left a check with Mr. Riker for the amount of the draft and notary's fees, for the purpose of taking up the draft, and requested to have it sent to the plaintiffs' office on that day, which Mr. Riker said would be done, or that he would tell Mr. Campbell that the plaintiffs wanted the drafts sent down. Riker delivered the check and did the errand when Campbell came in. Campbell took the check and paid the money to the defendants; but instead of sending the draft to the plaintiffs, he put it in his trunk and kept it until Tuesday morning, when Goddard called and inquired for it. On seeing the draft Goddard immediately pronounced it a forgery, and thereupon went to the defendants' bank and demanded back the money. Now in all this I am unable to see any thing like culpable negligence on the part of Goddard. He was told that there was such a draft—importing, of course, that it was a genuine draft. He got the information from the defendants' teller, and also from Mr. Riker, who received papers and answered questions for Mr. Campbell, to whose hands the defendants had intrusted the draft. But it is not necessary to connect the defendants with the information. When Goddard went to the notary's office, he told Mr. Riker he had been informed—not by the supposed drawers, but by persons in New-York—that Mr. Campbell had a draft in his hands drawn by the Canal Bank of Cleveland; and he left a check to take up such a draft—meaning of course a genuine draft. Neither Campbell nor his principals, the defendants, had any right to the check, except for the purpose of taking up a genuine draft; and when Campbell received the check and paid it over to the defendants, both he and they tacitly affirmed that the draft was genuine. Independently of the implied obligation to send the draft to the plaintiffs on that day, it would have been an act of prudence on the part of the defendants, or their agent the notary, to send it. But when we take into consideration the request that the draft should be sent, which was communicated to the notary when he received the check, it is clear that whatever of

negligence there was in the transaction was all on the [151] other side, and not on the side of the plaintiffs.

It is true that if the plaintiffs had not intervened, the notices would have been sent off on Monday, which was in time, instead of Tuesday, which was too late. But it is also true that had the notary performed the implied condition on which he received the check, and sent the draft to the plaintiffs on that day, he would either have learned that the draft was a forgery in time to give legal notice, or the plaintiffs would have concluded themselves by holding the draft, without declaring the forgery, until it was too late to give legal notice.

There was in truth no use in giving notice of the dishonor of the bill, with the view of charging any party to it. The defendants only had it for collection, and wanted no recourse. Notice to the supposed drawers could serve no purpose, because the bill was a forgery : and Moore, the payee, who forged the bill, was answerable to the Bank of Rutland, which he had defrauded, without notice.

It is said that early notice would have increased the probability of catching the felon. Let us examine that suggestion. If the plaintiffs had not intervened, notice would have been sent on Monday ; but it would have been notice of protest, and not of the forgery. The Bank of Rutland would have heard nothing about a forgery, until it should have got a response from the notice of protest sent to the Canal Bank in Ohio. There would have been a delay of a week at the least. Whereas as the case was, notice of the forgery, as well as of protest, was sent off the next day, both to the Bank of Rutland, and the Canal Bank. From this view of the case it seems reasonable to believe, that what was in fact done was more likely to prove beneficial to the Bank of Rutland, which owned the bill, than the thing which would have happened if the plaintiffs had done nothing.

But whatever may be the probability, or whoever else may be in fault, I think the plaintiffs have neither done any wrong, nor neglected any duty ; and am of opinion that the judgment should be affirmed.

[152] RUGGLES, J. (dissenting.)   Acceptance or payment of a bill of exchange or check by the drawee is an admission of the drawer's signature, which the drawee is not at liberty afterwards to contradict, as against a bona fide holder of the bill. The drawer is supposed to be the drawee's correspondent and acquaintance, with whose signature he is familiar, and negligence is therefore imputed to the drawee when he pays a bill to which the drawer's name is forged.   The duty of ascertaining whether the drawer's signature is genuine before acceptance or payment by the drawee, is imposed on him for the benefit and safety of the holder, who is entitled to know without delay after the presentment of the bill, whether it is accepted, or if payable at sight, whether it is paid.   This knowledge is necessary to enable the holder to take immediate measures against the previous indorsers and drawer, who are liable if the bill be dishonored.

It being the duty of the drawee to satisfy himself of the genuineness of the bill before he accepts or pays : and it being important to the holder and other previous parties that he should do so, it is settled that he accepts or pays at his peril. If he accepts he is bound to pay, although the drawer's signature turn out to be forged ; and if he pays he cannot recover back his money, unless the forgery is discovered and notice given immediately, or within such time as to give the holder the same advantage of proceeding against the party from whom he received the bill, as if it had been dishonored. (*Price* v. *Neale,* 3 *Burrow,* 1354 ; *Smith* v. *Chester,* 1 *T. R.* 654 ; *Smith* v. *Mercer,* 6 *Taunt.* 76 ; *Wilkinson* v. *Johnson,* 3 *Barn. & Cres.* 428 ; *Cocks* v. *Masterman,* 9 *id.* 922.)   The latter case seems to enforce the rule with too much rigor, because in case of the payment of a forged bill, it requires the discovery of the forgery to be made, and notice given on the same day, so as to give to the holder even earlier information of the forgery than he would have been entitled to upon the protest of the bill for non-payment.

The drawee is entitled to see the bill, and to have an opportunity to examine and inspect it, and if necessary to inquire as [153] to the drawer's signature, before he is bound to accept or

Goddard *v.* The Merchants' Bank.

pay, and it is his duty to exercise a due and proper caution, not only for his own sake but for the sake of the holder, who is not supposed to have the same means of detecting a forgery in the drawer's name, as are possessed by the drawee. It is not unreasonable to require the drawee to ascertain at his peril whether the bill is genuine before he accepts or pays. He incurs no responsibility to the drawer by refusing to accept, where there is reasonable ground of doubt; while by accepting or paying under such circumstances, the holder is induced to release his vigilance against the party from whom he took the bill, and may thereby lose the opportunity of compelling payment from him in case the bill should turn out a forgery. The rule, therefore, which requires that the drawee should by all the means in his power satisfy himself as to the drawer's signature before he accepts or pays, being reasonable and necessary, should not be departed from, or frittered away by exceptions resting on slight grounds.

The plaintiffs were not the drawees of the bill, but they were the friends and correspondents of the supposed drawers, and paid the bill for their honor. They stand in no better position in regard to the point in question, than if they had been the drawee; they were equally bound to see and examine the bill, and to decide at their peril as to its being genuine. (*See cases above referred to.*) They were no more entitled than the drawees to put the holder's right in danger, by negligent payment of a forged bill. When Mr. Goddard paid the bill he knew that the account between the Canal Bank of Cleveland and the American Exchange Bank had been closed. This appears from a passage in his letter to the Canal Bank, of the 21st of September. The fact that the draft purported to be drawn on a bank with which the drawees had discontinued their dealings, ought, it seems to me, to have awakened the suspicions of Mr. Goddard in relation to the draft, so far at least, as to have induced him to look at it before he paid the money. Instead of that, however, he paid it without having seen it, and as it seems to me, without the excuse of a want of opportunity to see it. The draft was [154] presented at the American Exchange Bank for payment on Sa-

turday, the 18th of September, when payment was refused. Having heard of the draft from the teller of the Merchants' Exchange Bank, and ascertained that it was in the hands of the notary, he called at the notary's office on Monday morning before the notary had come in, for the purpose of paying the draft, and made known his business to Mr. Riker, whom he found there. He was requested to wait a few minutes until the notary came, but declined doing so, and left his check with Mr. Riker to be handed to the notary for the payment of the draft, requesting that the notices of protest which had been prepared should not be sent out, and they were withheld accordingly. The plaintiff might without any difficulty have seen the bill. It was not withheld by the notary. The plaintiff might have obtained it during the day by calling or sending to the notary's office, in season to have discovered the forgery and to have despatched the notices to the previous parties. It is true the notary was requested to send the bill to the plaintiff's office, and that this was not done; but this was a request addressed to the courtesy of the notary, and not a demand which he had a right to make, or with which the notary was bound to comply. If Mr. Goddard's business made it inconvenient for him to call for the bill, it might be equally inconvenient for the notary to send it. There was no obligation on the part of the notary to send it. Riker, who was in the notary's office, does not swear that he promised to send it, or told him it would be sent. He thinks he said that the draft would be sent down, or that he would tell the notary that Goddard wanted it sent down. This is no proof of a promise to send it; and Mr. Goddard in his letter to the Bank at Cleveland, states that he requested it to be sent, but does not pretend that Riker undertook to send it or held out any expectation that it would be sent. The evidence forms, in my opinion, no excuse to the plaintiffs for not having exercised the usual and necessary caution of looking at the bill before they paid the money.

The plaintiff's counsel insist that negligence in paying the draft [155] unseen, is not imputable to the plaintiffs, because payment was made on the defendants' representation through their agent,

the notary, that there was a draft of the Canal Bank in existence when in fact there was not. But this reason is unsound. The holder of an indorsed draft, as we have before seen, has not the means of knowing whether the drawer's signature is genuine or not; but the drawee has. The holder looks to the drawee for information on that point, and the drawee does not look to the holder. The drawee on accepting or paying, answers that inquiry at his peril. There was in fact, in this case, no representation that the draft was genuine. The presentment of a draft is not such a representation. If it were so, it would always excuse payment without sight of the paper, and would subvert the rule on this subject which has been long settled and rests on the soundest reasons.

What were the consequences of the negligence of the plaintiffs, in paying the bill without having seen the bill? The forgery was discovered on the next day, as soon as Mr. Goddard inspected the bill, and it would have been detected on Monday, before payment, if he had acted with the ordinary caution, of seeing the bill on that day, as he might, without any difficulty, have done. In that case, it would have been the notary's duty to have informed the Bank of Rutland of the forgery, by letter of the same day, and this we are to presume would have been done. But the plaintiffs, on Monday, paid the bill without having seen it, and thus stopped the notice of the forgery; and the Bank of Rutland lost the advantage of a day's time in taking measures to compel the repayment of the money from Moore. The delay of a day is as effectual to discharge the holder of a bill under such circumstances, as the delay of a month or a year. It is only in those cases in which the drawee pays the bill without fault on his part, that the failure to give strict notice is excused. Such was the case in *The Canal Bank* v. *The Bank of Albany*. The indorser's name was in that case forged, and the drawee had no better opportunity to know or to ascertain this than the holders. Both stood in respect to the exercise of vigilance, on the same footing. And so in [156] the case of *The Bank of Commerce* v. *The Union Bank*, decided at the last term, where the body of the bill had been altered,

but the signature was genuine, it was held that negligence was not imputable to the drawee in paying the bill, because, although he was bound to know or ascertain the verity of the signature, it was not so as to the body of the bill, as to which it was no more incumbent upon him than upon the holder, to discover the forgery. Neither of those cases excuse neglect on the part of the drawee, in taking the usual care and precaution against paying a forged bill. Both those decisions rest on the ground that there was no negligence or fault to be imputed to the drawees, and in that respect they differ entirely from the present. This is a case of money paid by mistake; but by a mistake which happened through the negligence of the party who paid it; a mistake which in cases of this nature, must jeopardize the rights of the holder of the bill, and which for that reason ought not, on grounds of public policy, to be made the foundation of a claim to have the money restored. Mistake by the drawee in paying a forged bill, without negligence on his part, excuses the want of notice until the forgery is discovered. But mistake arising from the drawee's carelessness in paying a forged bill without sight, when the sight of the bill would have disclosed the forgery, is no excuse for the want of notice or the delay in giving it.

In the present case, it is evident, that if Mr. Goddard had looked at the bill on Monday, the 20th of September, the forgery would have been discovered on that day; and the Rutland Bank would have had notice in time to have caused the arrest of Moore at Cleveland. The letter which the Rutland Bank sent to the Bank at Cleveland, describing his person, arrived there, notwithstanding the delay in the notice of the forgery, on the same day that a person answering to that description had offered a forged certificate of deposit at that bank, but who could not be found after the arrival of the letter. Although it is not necessary in the present case, to show that the Bank of Rutland sustained actual damage by the delay, this circumstance exemplifies the propriety of the rule which requires vigi- [157] lance on the part of the drawee, for the benefit and safety of the prior parties to the bill.

This is perhaps a hard case upon the plaintiffs; but I am of opinion that they can not be permitted to recover, without overthrowing valuable and well settled principles of commercial law.

JEWETT, J. concurred with RUGGLES, J.

And thereupon the judgment of the superior court was affirmed.