ARNOTT AND ARCHER V. KANSAS PACIFIC RLY. CO.

1. BAILMENT; *Locatio Operis Faciendi ; Right of Property in the Thing Bailed.*
   A railway company, having a quantity of old and worn-out railroad iron,
   which it wished to utilize, entered into contract with a rolling-mill com-
   pany, by which the latter company was to re-roll into new bars or rails
   the old iron when delivered to it, and the rolling-mill company was to
   add to the old iron a certain amount of new iron to form the head or top
   of the new rails; and thereafter, under said agreement, old iron was de-
   livered to the rolling-mill company by the railway company, and new
   rails were manufactured therefrom, with occasional additions furnished
   by the rolling-mill company, the railway company supplying the chief
   or principal part of the materials for the new rails: *held*, that the right
   of property to the iron, while the work was going on and to the rails,
   when completed, remains in the railway company; and *held also*, that
   the transaction between the two companies is of the nature of the bail-
   ment denominated by law-writers of the class *locatio operis faciendi.*

2. ACCESSION; *The Party Furnishing the Principal Part of the Material, Has
   the Title.* In such a transaction, as above stated, the material inquiry
   is, which company furnishes the chief or principal portion of the ma-
   terial for the manufacture of the new rails; and where the old and new
   rails are levied upon in the possession of the rolling-mill company, as
   the property of the latter company, and are afterward replevied by the
   railway company as its property from the officers making such levy,
   and on the trial of said replevin action the president of the rolling-mill
   company, introduced by the plaintiff to prove the process of the manu-
   facture of the new rails, testifies in full as to such process, and states he
   is familiar with the details of the manufacture of the rails, it is material
   error for the district court to refuse to defendants the right to show by
   such witness the amount of new iron intermingled with the old iron in
   the process of manufacturing the old rails of the railway company into
   new ones.

*Error from Shawnee District Court.*

REPLEVIN, brought by the *Railway Company*, to recover
possession of "a specific mass of railroad iron in bars and
flats, amounting in weight to about three hundred tons." The
material facts are stated in the opinion, *infra*. Trial at the
December Term 1874 of the district court. The following
are the instructions given by the court to the jury:

"1. This is an action of replevin, in which the plaintiff
seeks to recover the possession of a lot of iron described in

the petition, alleging that at the commencement of this action it was the owner of said iron and entitled to the possession thereof, and that the same was then unlawfully detained by the defendants.

"2. The defendants claim that this iron was the property of the Topeka Rolling-Mill Company, and was levied upon by them, as constables, under and by virtue of writs of attachment and execution in their hands against said mill company.

"3. If this iron was the property of the plaintiff, and was by it delivered to the Rolling-Mill Company to be re-rolled into rails and returned to it, this arrangement did not change the ownership of the iron, even if in the process of rolling other iron was used and added to it by the mill company. In such case, the iron, when manufactured, and during the process of manufacture, including the added material, would still remain the property of the plaintiff.

"4. The plaintiff claims ownership, and right of possession by virtue of said ownership. The defendants may show right of possession either in themselves, or in any other person or corporation than the plaintiff; and a showing of either, is sufficient to defeat the plaintiff's recovery.

"5. Proof that the plaintiff delivered old railroad iron to the Topeka Rolling-Mill Company, without showing the amount delivered, or the amount received back (it appearing that some iron had been received back,) is not *alone* sufficient to entitle the plaintiff to a recovery.

"6. Identification of the property in question is an essential requisite to plaintiff's right to recover. That is, plaintiff must show that the specific property belongs to the plaintiff, and not merely that the plaintiff has a certain amount of *like property*, or a number of articles of *the same kind* as those replevied. So, if the jury find from the evidence that the plaintiff delivered to the Topeka Rolling-Mill Company old, worn and broken railway iron, for the purpose of having it re-manufactured or re-rolled, the Rolling-Mill Company to furnish some new iron, called 'head iron,' which was necessary to the re-manufacture, and then to re-deliver to the plaintiff the same weight of new rails as was delivered of the old ones; that said old iron was rolled into the form of flat bars, called 'flats,' in the usual process of re-manufacture, and that the said old iron was, either before, or after, or during such partial re-manufacture, mixed or intermingled with a considerable quantity of iron which belonged to any other person or corporation, so that at the time of the levy by the defend-

ants it was impossible to distinguish or divide the iron which was delivered by the plaintiff from such other iron, then the plaintiff cannot recover in this action, and the jury must find in favor of the defendants.

"7. An artificer's or mechanic's lien on personal property is not the subject of levy as against the owner of such property in the hands of the artificer or mechanic, under execution against such artificer or mechanic.

"8. The plaintiff must recover, if at all, upon the weight and preponderance of the evidence in its favor. If you find from the evidence that at the commencement of this action the plaintiff was the owner of and entitled to the possession of said iron, your verdict will be for the plaintiff. If you do not so find, your verdict will be for the defendants.

"9. If you find for the defendants, you will also find what was the value of their possession, which will be the amount due on the executions and attachments levied by them on the property, including interest at the rate of seven per cent., and the costs that have accrued in those cases.

"10. If the jury find in favor of the defendants, then the measure of their recovery will be the amount due on said executions and attachments, admitted to be $2,508.37, unless that sum exceed the value of the iron, in which case it will be limited to the value of the iron.

"11. The jury are the exclusive judges of the evidence, of its weight, and of the credibility of the witnesses."

The 6th and 10th of the foregoing instructions were prepared by defendants, and given at their request. The defendants excepted to the 3d, 4th, 5th, and 7th of said instructions. Defendants also asked the following instructions, which were refused by the court:

"1st. If the jury find from the evidence that the plaintiff delivered to the Topeka Rolling-Mill Company old, worn and broken railway iron, commonly known as T rails, for the purpose of having it re-manufactured or re-rolled, the Rolling-Mill Company to furnish some new iron, called 'head iron,' which was necessary to the re-manufacture, and then to re-deliver to the plaintiff the same weight of the new rails as was delivered of the old ones; that said old iron was rolled into the form of flat bars, called 'flats,' in the usual process of re-manufacture, so that it became impossible to identify any one of said 'flats' as the product of any one of said rails, then the plaintiff cannot recover in the action.

"2d. If the jury find from the evidence that the Topeka Rolling-Mill Company carried on the business of re-manufacturing, rolling or re-rolling railway iron, and that the plaintiff delivered to said rolling-mill company a large quantity of railway iron, for the purpose of having it re-manufactured or re-rolled into new rails, for a compensation to be paid by the plaintiff; that said rolling-mill company had proceeded with said re-manufacture or re-rolling so far as to heat and weld the old iron and transform it into the flat bars called 'flats' which were replevied in this action, that being the usual process of re-manufacture or re-rolling, then said rolling-mill company had a lien upon and interest in said iron; and if any sum was due the rolling-mill company by the plaintiff at the commencement of this action, for the work done on said iron, then the plaintiff cannot recover in this action, and the jury must find in favor of the defendants." .

"3d."—[The third instruction asked and refused was in the words of the 4th instruction given, as above, with the addition of the following words: "And the burden of proof is upon the plaintiff, to show that all the iron replevied in this action is the same iron which it delivered to the Topeka Rolling-Mill Company."]

"4th."—[The fourth instruction asked and refused, is exactly like the 5th instruction given by the court, omitting the word "*alone*."]

Verdict and judgment for the plaintiff, and defendants, *A. A. Arnott* and *Thomas Archer*, bring the case here on error.

*D. Martin*, for plaintiffs in error:

1. The court erred as to the admissibility of evidence. Questions were propounded to the witness Coldren, in cross-examination, and ruled out, as improper. The first two questions were intended to show the jury the process undergone by the Kansas Pacific railway iron in being made into new rails. The witness was president of the rolling-mill company, and familiar with the details of the business. He had explained the usual process. We desired to show that the Kansas Pacific iron was to, and did, pass through the same process. The court allowed us to prove what was done with the particular iron replevied, from the time it was de-

livered to the rolling-mill company until it was taken by the sheriff. This limited the evidence to a part of the iron only, and to a part of the process only. We should have been allowed to bring out the whole truth. It appeared from his cross-examination that two other railroads had sent old iron to said rolling-mill to be re-rolled about the same time that the Kansas Pacific iron was there. We desired to show by him that the iron of the different roads was not kept separate, and that the rolling-mill company did not pretend to deliver to each railroad the identical metal received from it, and the question was relevant. The identity of the iron replevied with that delivered, was necessary to a recovery by the plaintiff, and so the court instructed the jury. But by this ruling the court excluded the testimony by which we expected to show that the iron replevied could not be identified as that furnished by any particular railroad.

2. The instruction given by the court assumes that the transaction between the railway company and the rolling-mill company was a bailment coming under that subdivision designated as *locatio operis faciendi;* but it is of the essence of such a bailment that the thing bailed is to be returned when the purpose of the bailment has been accomplished. Could it have been the intention that all the old iron delivered by the railway company in this transaction was to be returned to it by the rolling-mill company? We think the evidence shows the contrary. Suppose that to one hundred tons of old iron the rolling-mill company was to add twenty tons of new for "head iron," and that in the process of re-manufacture five tons of the one hundred and twenty tons are lost in dross and waste: then we have one hundred and fifteen tons of new rails. Now, which corporation owns these new rails? The court below instructed the jury, in effect, that *all* of them would belong to the railway company. We think they would *all* belong to the rolling-mill company, but that it would *owe* the railway company one hundred tons of them in kind, on being paid or tendered the agreed price for re-

manufacturing. The railway company could certainly have no claim whatever on the fifteen tons remaining.

It is quite obvious that this transaction was what the Civilians would call a *mutuum*, rather than a regular bailment — that the iron in the possession of the rolling-mill company was what the Scotch and French lawyers denominate a *fungible*; that by the delivery of the iron by the railway company to the rolling-mill company, the title of the property passed to the latter; and that the obligation to deliver the new rails to the railway company, on payment or tender of the price of re-rolling, became a debt. The transaction constituted one of those innominate contracts of the Civilians which are to be governed and interpreted by the law of sale, or barter, rather than by the law of bailment. It results, that the title of the iron being in the rolling-mill company, the defendants below had a right to levy their executions upon the same, and that the plaintiff below ought not to have maintained its action of replevin: Jones on Bail. 64, 102; Doct. & Stud., ch. 38, pp. 219, 220; Story on Bail., § 439, 283, 284, 370, 47; 2 Kent's Com. 573, 589; 2 Pars. on Contr. (5th ed.) 133, and note *v;* 7 Cow. 752, and note *a*, p. 756; 21 Wend. 83; 2 Comst. 153; 7 Hill, 497, 498; 3 Mason, 478; 10 Me. 31, 33; 11 Penn. St. 264; 1 Blackf. 353; 12 Ind. 252; 1 Ohio St. 244.

The court modified the 3d instruction asked by defendants by striking out these words, to-wit: "And the burden of proof is upon the plaintiff to show that all the iron replevied in this action is the same iron which it delivered to the Topeka Rolling-Mill Company." And in said modified form the instruction was given. The refusal to give the instruction as asked, added emphasis to the instruction given by the court to the effect that the new or added material, as well as the old, belonged to the railway company — a notion based upon the erroneous idea that the transaction was a *locatio operis faciendi*, instead of a *mutuum*. In our view the case was tried throughout under a misapprehension of the legal nature

of the transaction between the railway company and the rolling-mill company. The law of an ordinary bailment *locatio operis faciendi* was applied to a *mutuum;* while a *mutuum* is in effect a sale, except that the consideration is received in kind, not in money. This error runs through the instructions and the questions raised in the introduction of testimony, and will require a reversal of the judgment.

The court ruled very explicitly, that the interest acquired by an artificer in goods upon which he had performed labor, and on which he holds a lien, is not subject to levy under an execution against the artificer, and testimony offered by defendants upon this point was excluded. In support of our views, we cite, Laws 1872, p. 298, ch. 142; Story on Bail., §440; 9 How. Pr. 569–573; 42 Barb. 411; 4 Wend. 293. That undivided interests in chattels may be sold on execution, see, 21 Conn. 148, 157; 2 Ga. 73, 76; 15 Mass. 82; 7 Gray, 416.

3. The verdict was not sustained by sufficient evidence, and is contrary to law. It devolved upon the railway company to show that the iron replevied was its property. Yet it did not even show how much iron was delivered to the rolling-mill company, nor how much was received back from it. For aught that appears in the testimony (which is all in the record,) the railway company may have received, prior to the commencement of this action, as much new iron as it delivered to the rolling-mill company in old rails and scraps. In that case, we think the railway company could recover nothing more, notwithstanding the instruction that the added material would belong to the railway company. The evidence shows that the rolling-mill company was re-rolling for two other railroads during the same season, and furnishing the new metal for head iron, and that the iron of the three different railroads was not kept separate. Indeed, it distinctly appears that there were delivered to the K. P. railway company seventy or eighty tons of new rails made out of the Hannibal & St. Joseph iron. From this showing it does not

appear that *any* of the iron levied on by defendants belonged to plaintiff, much less *all* of it, even on the hypothesis that the transaction between the plaintiff and the rolling-mill company was a *locatio operis faciendi*, instead of a *mutuum*. The jury seems to have entirely misapprehended the purport and effect of the evidence, and is therefore at fault as well as the court, and the judgment should be reversed so that the case may be properly tried.

*C. E. Bretherton*, for defendant in error:

1. This case is brought here by plaintiffs in error under an entire misapprehension of the law applicable to the case. Their theory is that the property in the iron, which is conceded to have originally belonged to the railroad company, would pass from the railroad company to the rolling-mill company, if they could prove that it became so mixed with iron belonging to two other companies that the iron belonging to each could not be separated. Such would not be the law. The mixture of the various iron, would not transfer the property in it to the common bailee, but would make the original holders tenants in common, according to their respective quantities of the general mass; and if afterward the other owners withdrew their proportion, the sole property in the balance would be in the remaining bailor.

A small part of the iron had been completely converted into new rails, and a certain proportion of new iron belonging to the rolling mill was made use of in the process. It is claimed that the mixture of this new iron made the whole mass the property of the rolling mill. This is erroneous, because such a mixture would in any case only entitle the rolling mill to their proportion, as tenants in common, of the entire mass. But as a matter of fact this rule is not applicable to this particular case, first, because the evidence clearly shows the new iron was sold by the rolling mill to the railroads, and the property thus transferred to them, and that the rolling-mill company at the most had but an artificer's

lien for the price of the additional iron and the workmanship; and second, because it is shown that the new iron was merely added as an accessory to the old.

The real legal question below was, whether the transfer of the old iron by the railroad company to the rolling mill was a bailment, or a sale. If the contract between the parties was, that in consideration of so many tons of old iron, and so much money, the rolling-mill company would deliver to the railroad company so many tons of re-rolled iron, the contract was a sale; if the contract was, that the rolling-mill company would re-roll the old iron delivered to them, and put in a certain amount of new iron for the purpose, then the contract was only a bailment of the iron, and the property remained in the railroad company. The admixture with iron belonging to other companies could create at most a question of parties; and no such objection was raised by demurrer or answer, and it is therefore waived. But in any case, one tenant in common is entitled as against all persons but his co-tenants to the exclusive possession of the property, and may recover it in an action against an adverse possessor without making his co-tenants parties. (15 Cal. 371.) His possession is *per my et per tout*. This is the rule at least under reformed systems of procedure. At common law it may have been otherwise. (Barbour on Parties, 110; 15 Me. 255.) But even at common law the non-joinder of other tenants in common could only be pleaded in abatement, and not in bar. (4 Mass. 515.) The distinction between a bailment and a sale was long since laid down by Bronson, C. J., in *Mallory v. Willis*, 4 Comst. 85, and has been ever since universally followed. See, 1 Ohio St. 244; 19 Ohio, 344; 7 Lansing, 79; 23 Wis. 643; 4 N. Y. 156; 6 N. Y. 64, 461; 8 N. Y. 433; 92 U. S. 563; 21 Wend. 83; 1 Blackf. 353; 12 Ind. 252; 13 Minn. 174; 11 Penn. 264; 32 Me. 404; 7 Johns. 472. The rules of the civil law can be found in Domat, vol. 1, p. 132; Pothier, Du Domaine de Propriete, p. 107; Contrats de Bienfaisance, I, p. 171; Code Nap., art.

565, 1892; and are substituted for the common-law rules in the California Code, §§ 577, 1025.

As to the question of levy on the alleged lien of the rolling-mill company: While the proposition may not be free from doubt, that a mere possessory lien cannot in any case be taken in execution, the question does not arise in this case. Our artisan's lien is regulated by statute, and not by the common law. Laws of 1872, ch. 142, § 1. As to the flats, it is clear the mill company could have no lien, because the work was incomplete; had they sold the iron while in flats, it would have been a conversion; and equally so for the sheriff to attempt to do it. Nor could the right to finish re-rolling and receive payment, be the subject of sale, because the bailment was personal, and called for the skill and appliances at the service of the mill company, and not of any casual assignee. Like all executory contracts of labor, where the skill of a particular person or the resources of a particular establishment is contracted for, it was not assignable, and therefore not capable of judicial sale. The case of the completed rails may not be so clear. The mill would then be in the position of a mere pledgee for money, with a statutory power of sale, and such an interest might perhaps be within the cases cited by plaintiffs in error. There is not a particle of evidence that the railroad company were in debt to the rolling-mill company, while Coldren testified expressly that the mill had no money interest in the iron; and of course, without a debt there could be no lien.

· 2. The questions asked Coldren, the president of the mill company, on cross-examination, were properly excluded because irrelevant to the issue. The amount of new iron did not affect either the question of ownership, or of lien. The lien depended on the existence of a debt; the ownership, on the contract between the parties. Neither the amount of work in the bars, nor the worth of the labor, was material to the issue. The question was simply, was money due the rolling mill, for which they had a lien on the iron.

3. As to the instructions: Defendant's 1st instruction was properly refused, as inaccurate. Confusion of the iron of different bailors would not, as assumed by this instruction, vest title in the common bailee. If the issue was, whether the contract between the mill and the railroad was *mutuum*, or bailment, then it was a matter for the jury below, and there being some evidence to sustain their verdict, its weight will not be considered by this court. The 2d instruction asked was also properly refused. It is inaccurate, because it assumes a lien would exist before the work was completed; and it is altogether erroneous in further assuming that the question of indebtedness was before the jury. A lien presupposes a debt, and no evidence was offered in the case to show that the K. P. railway company was indebted to the mill, while Coldren directly testified that the latter had no money-interest in the iron. Nor was there error in striking out the last clause in defendant's 3d instruction. It is inaccurate in assuming that either confusion or addition would transfer the property from the bailor to the bailee. The addition of the word "alone," in the 4th instruction asked, (the 5th given by the court,) was proper. Without the addition of the word *alone*, the instruction would have been altogether inapplicable. The receipt of old iron by the mill was material, and a proper matter to go to the jury with other evidence.

The 6th instruction given by the court was more favorable to defendants in error than they had a right to expect. If it were proved either that plaintiff below was a tenant in common of the iron with other bailees, or, that other bailees having withdrawn their proportion of the iron, left this as the proportion of the Kansas Pacific, although not the identical iron, plaintiff would be entitled to recover; and this, although to the bailor's iron was added new iron in the process of re-rolling, when the contract provided for labor and new material being used in the process of re-rolling and paid for in money. Neither party, it seems, attached sufficient importance to the exact character of the contract between the

8—19 KAS.

railroad and the mill.   There was no evidence to go to the
jury that there was a debt due by the railroad to the mill,
and therefore, whether a lien, subject to levy, existed on the
completed bars or not, is immaterial; hence, the 7th instruc-
tion given by the court, even if erroneous, did no harm.

The opinion of the court was delivered by

HORTON, C. J.: The following is a general statement of
the facts in this case: In August and September 1874, the
plaintiffs in error, who were constables of Shawnee county,
held several executions issued by justices of the peace of said
county on judgments against the Topeka Rolling-Mill Com-
pany, a corporation doing business in North Topeka.   The
executions amounted in all to $2,508.37; and certain iron,
being in possession of the rolling-mill company, the consta-
bles levied upon it as the property of this company, to satisfy
their executions.   The iron was so held by them as such
constables when the K. P. Rly. Co., on 23d September 1874,
commenced this action in the court below in replevin to re-
cover the possession of the property.   The said personal prop-
erty was described in the petition as follows: "The specific
mass of railroad iron, in bars or flats, amounting in weight
to about three hundred tons, now stacked in North Topeka,
near to and south of the track of K. P. Rly. Co., and about
one hundred and fifty yards east of its depot, in North To-
peka aforesaid, being all the railroad iron stacked in such
locality."   The railway company claimed to be the owner of
the iron, and that the rolling-mill company was only its
bailee.   The proof tended to show that the railway company,
having a large quantity of old and worn-out railroad iron
which it wished to utilize, entered into a contract with the
rolling-mill company by which the latter company would re-
roll into new bars or rails the old iron delivered to it, and
put in a certain amount of new iron, called "head-iron," to
form the head, or top of the rails.   The course of business
was to weigh in the old iron, cut it up, heat several pieces
together to a welding heat, roll it into flat pieces, add the new

iron, heat it again (several pieces together) to a welding heat, roll it into rails, and weigh out to the railway company the number of tons of new iron weighed in of the old, charging so much per ton for all the new rails so made. The defendant in error made several consignments of old iron to the rolling-mill company during the summer, and received back a large quantity of new rails; but the evidence does not show how many tons of old iron the defendant in error consigned to, nor how many tons of new rails it had received from, the rolling-mill company. Nearly all the iron replevied in this action had gone through only one of the heating processes, and was in flat pieces called "flats." There were also about twenty-five tons of new rails or bars in the mass in dispute. Verdict and judgment in favor of the railway company.

The first question is, as to the character of the transaction between the railway and rolling-mill companies. Counsel for plaintiffs in error contends that it was what the civilians would call a *mutuum*, rather than a regular bailment; that the iron in the possession of the rolling-mill company was what the Scotch and French lawyers denominate a *fungible;* that by the delivery of the iron by the railway company to the rolling-mill company, the title passed to the latter; that the obligation to deliver new rails to the railway company on payment or tender of the price of re-rolling became a debt, and therefore, that the personal property levied upon was liable to be sold to pay the judgments against such rolling-mill company. Said counsel assigns as error the holding of the court below, that the transaction between the companies was a bailment under that subdivision designated by Sir William Jones in his work on bailments as *locatio operis faciendi*, and classified by Pothier, in his definition of contract of hire, as a regular contract of hire, that is, that contract of hire where the specific thing which is let to hire is to be returned. We think that the learned counsel misconceives the law as applicable to the facts discussed, from an attempt to marshal the case *nolens volens*, within the definition of the *mutuum* of the Romans, because it differs slightly from the common bail-

ment classified as *locatio operis faciendi.* While it is true, that the transaction between the two companies varies from the terms of either a regular or an irregular contract for hire, yet if any technical term is to be applied to it, it must be placed in the category of bailments denominated *locatio operis faciendi*, rather than that of the *mutuum*, or *fungible*, of the law-writers. In other words, by the rules of the common law and the decisions of this country, the transaction was a regular contract of hire, in contradistinction from an irregular contract of hire, if the railway company furnished the chief or principal part of the material of the new rails, and if such was the case, the proprietary interest in the iron let was not changed, but remained in the latter, viz., the Kansas Pacific Railway Co. This conclusion is based on the rule that, as the law does not favor tenancy in common in such transactions, and as the addition of inconsiderable accessorial material to the chief or principal material in the manufacture of an article may be deemed an actual sale by delivery of such additional material to the original owner, such original owner, so far from losing his general property in the thing thus placed in the hands of another person for manufacture, acquires that right to whatever minor accessorial additions are made in bringing it to its new and improved form. In *Slaughter v. Green*, 1 Rand. 3, it was held that where wheat was delivered at a mill to be ground upon an agreement that the miller should return to the farmer a given quantity of flour for so many bushels of wheat, the miller was a bailee, and not a purchaser. In *Foster v. Pettibone*, 7 N. Y. 433, it was held that where a contract is made with the manufacturer to deliver him raw materials to be returned manufactured, the contract is one of bailment, and not of sale, and the title to the article when manufactured remains in the original owner. In *Pierce v. Schenck*, 3 Hill, 28, it was held, if logs be delivered at a saw-mill, under a contract with the miller that he shall saw them into boards within a specified time, and that each party should have one-half of the boards, the transaction inures as a bailment merely, and the bailor retains

his general property in the logs till all are manufactured pursuant to the contract; and it was further held in the case, that where the miller, after sawing a part of the logs into boards within the time, failed to perform as to the rest, and converted both the boards and the logs to his own use, the bailor might recover in trover for the whole, and that the miller was not entitled to any deduction on account of what had been actually sawed. In *Wilson v. Nason*, 4 N. Y. 156, it was held that when one who has possession of the owner's wheat mixes it with other wheat of the same description and quality, whether his own, or belonging to third persons, without the consent of the owner, the latter does not lose the title to his wheat. He may call for a division, or when the other parties have received from the mass their several quantities, he may claim and recover the residue as his separate parcel. Identification of the very grains of wheat is not necessary. In *Pulcifer v. Page*, 32 Me. 404, it was held that where a chain was made of broken links belonging to different parties, that a right of property by accession occurs when materials belonging to several persons are united by labor into a single article. The ownership of an article so formed is in the party, if such there be, to whom the principal part of the material belonged. In *Merritt v. Johnson*, 7 Johns. 472, it was held that when the materials of John are united with the materials of Richard by the labor of Richard, who furnished the principal materials, and those of John are only accessory, the right of property in the whole belongs to Richard by right of accession. So if A. deliver to B. some cotton yarn on a contract to manufacture the same into cotton plaids, and B. was to find the filling, and A. agreed with B. to have the particular yarn with the fillings to be found by B. made into plaids on joint account, and the plaids when woven were to be divided according to their respective interests in the value of the materials, and the plaids, before the division, had been burnt by an accidental fire, the loss would have been mutual, each losing the materials furnished by himself. Story on Bail., § 420. Again, where materials are furnished to a work-

man to manufacture into some article, the case is still treated as a mere bailment, although the workman may add some accessorial materials or ornaments. Thus, if A. sends cloth to a tailor to be made into a garment, and the tailor furnishes buttons and twist to complete it, it is a mere case of *locatio operis faciendi.* Story on Bail., § 423; *Gregory v. Stryker,* 2 Denio, 629.

In the case at bar, old rails, as the material, were furnished by the railway company to the rolling-mill company to manufacture into new rails; and in view of the above authorities, and the conclusion we have reached, it was important on the trial to show how much old and how much new iron entered into the new rails. The court below seems to have assumed that the accessorial material added by the rolling-mill company in the way of new iron, which formed the top of the rail, was the lesser part of the iron used in the manufacture of the rails; and such, perhaps, was the case. But the district court committed error in *assuming* such to be the fact, and in refusing to permit the plaintiffs in error to prove the materials of the new rails.

While the witness Coldren was upon the stand, after having testified concerning the process undergone by the Kansas Pacific railway iron in being made into new rails, and that he was familiar with the details of the business of the manufacture of the new rails, he was asked on cross-examination: "How much new iron did you put in with the old, in the process of manufacturing these old rails of the Kansas Pacific Railway Company into new ones?" The defendant in error objected to the question, and the court refused to allow the question to be asked, or answered. The question was pertinent and important. Its rejection by the court was substantial error, and prejudicial to the rights of the plaintiff in error. It is probable, if the witness, who was the president of the rolling-mill company, had answered the interrogatory, it would have been fully established that the material furnished by the railway company formed the chief portion of the new rails; but this is only a presumption from other

evidence in the case; and as the inquiry was a legitimate one, and as the jurors were the parties to be informed of the various amounts of metal furnished by the two companies in the manufacture of the rails, the case must be reversed. The court had no right to judicially determine the amount of new material added to make the top of the rails, nor to deprive the plaintiffs in error from proving how much was used therefor. Again, it was clearly incumbent on the part of the defendant in error to show by the proof, that, as to the twenty-five tons of new rails which were replevied, the material thereof was principally the property of the Kansas Pacific Railway Company; and the refusal of the court to permit the president of the rolling-mill company to be cross-examined on the subject, at a time the matter was a proper subject of examination, left the question of the amount of material furnished by each company in the manufacture of the new rails to be decided by the jury upon other testimony, and this was of an indirect and indefinite character. The best evidence upon this point was held inadmissible.

The judgment will be reversed, and a new trial awarded.

All the Justices concurring.